## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| **ANGELA MELANCON,** | * | **CIVIL ACTION NO.** |
| | * | |
| *Plaintiff* | * | |
| | * | **JUDGE** |
| **VERSUS** | * | |
| | * | **MAGISTRATE JUDGE** |
| **LAFAYETTE GENERAL MEDICAL** | * | |
| **CENTER, INC d/b/a OCHSNER** | * | |
| **LAFAYETTE GENERAL MEDICAL** | * | |
| **CENTER** | * | |
| *Defendant* | * | **JURY TRIAL DEMANDED** |
| * * * * * * * * * * * * * * * * * * * * * * * | | |

## COMPLAINT

**NOW INTO COURT**, through undersigned counsel, comes Angela Melancon, Plaintiff

herein, who respectfully states and avers the following:

### PARTIES

1.

Plaintiff, Angela Melancon (hereinafter "Ms. Melancon" or "Plaintiff"), is a Caucasian

female of the full age of majority, presently residing and domiciled in Lafayette Parish, State of

Louisiana.

2.

Made Defendant herein is Lafayette General Medical Center, Inc., d/b/a Ochsner

Lafayette General Medical Center (hereinafter "Ochsner" or "Defendant"), a domestic

corporation maintaining its principal place of business in Lafayette Parish, Louisiana, and is

authorized to do and doing business in the State of Louisiana.

1

## FACTUAL BACKGROUND

3.

On or about March 30, 1992, Ms. Melancon began her employment with Ochsner as a Security Officer. Throughout her employment with Defendant, from 1992 to the present, Ms. Melancon progressed steadily in title and responsibility.

4.

On or about 2009, Ms. Melancon was promoted to Security Operations Manager and, in year 2015, after several security management personnel retired, Defendant tasked Ms. Melancon with managing the security at five (5) of Defendant's health care facilities and supervising and directing the activities of 45 security officers.

5.

Though Ms. Melancon was tasked with performing the responsibilities of several former employees, her compensation and benefits package never reflected her increased workload and her job title remained the same.

6.

Nevertheless, throughout her career, Ms. Melancon received only positive job performance evaluations and consistently qualified for all available annual bonuses.

7.

On or about December, 2020, Defendant posted a job vacancy for the Security/Safety/Emergency Prep Manager's position.  The position description describing the posted manger's position was identical to the task and responsibilities currently performed by Ms. Melancon.

8.

Nevertheless, on or about February 21, 2021, Defendant hired Donnie Simon to become Defendant's Director of Security/Safety/Emergency Prep of the health system.  Simon became Ms. Melancon's supervisor.

9.

Importantly, Ms. Melancon, for a period of six months, was required to train Simon on how to carry out the duties and responsibilities of the Director's position.  In response, Simon raved to his supervisor, Defendant's CEO, about Ms. Melancon's commitment, dedication and expertise in carrying out her job responsibilities and her responsiveness to Defendant's security staff.

10.

As noted above, Ms. Melancon performed her job duties admirably, without complaint and carried out her supervisory responsibilities in strict compliance with Defendant's policies and procedures.

11.

Notwithstanding Ms. Melancon's job performance, Defendant, on or about July 8, 2021, without lawful reason, explanation or justification, adversely altered the terms and conditions of her employment and threatened Ms. Melancon with termination.

12.

The stated basis for Defendant's adverse employment action was Ms. Melancon's alleged failure to demonstrate several elements of Defendant's standards of behavior when responding to or addressing an employee that calls in ill—which Plaintiff alleges herein to be a mere pretext for unlawful retaliation.

## UNLAWFUL RETALIATION

13.

Specifically, on or about March 4, 2021, Ms. Melancon met with an employee that she supervises, Lydia Bernard, to discuss various techniques regarding how to properly address an employee whose job performance is substandard.

14.

In response to Ms. Melancon's "coaching" efforts, Lydia Bernard, who is African American, aggressively moved into Ms. Melancon's personal space and said "Yessa massa, yessa massa! I will do whatever you tell me too."

15.

Because of Bernard's racially offensive conduct, Ms. Melancon reported Bernard's behavior to Defendant's Human Resource Department ("HR").

16.

Ms. Melancon informed Defendant's HR representative, Monshita Givens, that Bernard completely and utterly humiliated her when Bernard antagonistically and intentionally invaded her personal space and referred to her as a "slave owner."

17.

Even though Bernard's behavior was a clear violation of Defendant's workplace policy and was responsible for demoralizing a 30year exemplary employee, Defendant decided to only issue Bernard a written reprimand for her behavior.

18.

Because Ms. Melancon believed that Bernard's behavior should not be tolerated or glossed over, when she was informed of Defendant's decision regarding Bernard, Ms. Melancon

expressed her disappointment to Defendant's HR representative.  As a result of Ms. Melancon's continued effort to eliminate racial harassment in the workplace, Defendant eventually placed Bernard on a three (3) day suspension.

19.

However, instead of applauding Ms. Melancon for her efforts to end discriminatory mistreatment and/or harassment in the workplace, Defendant, as noted above, adversely altered the terms and conditions of Ms. Melancon's employment and threatened her with termination

20.

First, the private communications between Ms. Melancon and Defendant's HR representatives regarding Bernard's "slave owner" comment became public knowledge.

21.

As a result, Ms. Melancon's supervisor, Simon, and several members of Ms. Melancon's staff, seemingly out of nowhere, began complaining about Ms. Melancon's job performance.

22.

After nearly 30 years of employment with absolutely no write-ups, reprimands, suspensions or any other types of corrective action, Simon and members of Defendant's security staff began accusing Ms. Melancon of the following:

    A.  Treating members of the security staff unfairly;

    B.  Engaging in bullying, workplace harassment and verbally abusive behavior;

    C.  Belittling members of the security staff regarding their body size and sexual preference;

    D.  Threatening members of the security staff with termination;

    E.  Causing workplace conflict;

F.  Leaking confidential information;

G.  Engaging in retaliatory type conduct if directives were questioned by
members of the security staff;

23.

As noted above, on July 8, 2021, Ms. Melancon's supervisor, Simon, issued her a written reprimand accusing her of failing to "demonstrate several elements of [Defendant's]standards of behavior which include supportiveness, etiquette, respect, and communication."

24.

According to Simon, the written reprimand was issued because Ms. Melancon did not properly advise a "team leader" on how to respond to or communicate with a contract employee who was feeling sick.

25.

According to Simon, instead of showing empathy, Ms. Melancon sent the contract employee a "text wanting to know if she was at work but never inquired how she was feeling."

26.

According to Simon, because Ms. Melancon allegedly did not show empathy, Ms. Melancon was "issued an [Employee Discipline Form] for this infraction….[and warned that]… Any other future infractions may result in further disciplinary action up to and/or including termination of employment."

27.

Incredibly, Simon, hired just six-months earlier, who was not only trained by Ms. Melancon but also praised Ms. Melancon's commitment, dedication and expertise in carrying out her job responsibilities and her responsiveness to Defendant's security staff, was now threatening

6

to terminate Ms. Melancon's employment because she allegedly failed to show empathy to a contract worker who was feeling ill.

28.

Moreover, after issuing Ms. Melancon a disciplinary form and threatening her with termination, Simon and other Defendant security personnel, made Ms. Melancon's workplace environment a living hell.  So much so that Ms. Melancon is under a physician's care and was required to take a medical leave of absence from her employment so that she could handle the emotional stress that was intentionally inflicted upon her because she exercised her federal and state protected right to oppose discrimination in the workplace.

**CAUSES OF ACTION**

29.

All of the actions complained of herein were undertaken with malice and/or reckless indifference to Ms. Melancon's civil rights in direct violation of law.  By the conduct described above, as engaged in by Defendant's agents and employees and for which Defendant is fully liable under the doctrine of respondent superior, Defendant engaged in unlawful employment practices against Plaintiff because she opposed discriminatory practices in the workplace.

30.

By the conduct alleged herein, Defendant, through its agents and managers, established and maintained a pattern and practice of discriminatory treatment towards Plaintiff by engaging in arbitrary adverse actions against Ms. Melancon, in violation of company policy, which created an environment incompatible for Plaintiff to maintain and or better her position.  Defendant's treatment of Plaintiff affected the terms and conditions of Plaintiff's employment in a negative way with no basis in policy, performance, or law.

31.

Ms. Melancon is and was qualified for her position. She engaged in protected activity, an adverse employment action occurred, and a causal link exists between the protected activity and the adverse action.

32.

Plaintiff sought to oppose discriminatory practices in the workplace internally through Defendant's HR Department by filing a complaint. She was unsuccessful.  After filing her complaint, instead of coming to Plaintiff's aid, Defendant engaged in workplace harassment which affected Ms. Melancon's job performance and health.

33.

Defendants are liable for damages for retaliation pursuant to Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1866, as amended, 42 U.S.C. §1981 (1994), *et seq.*.  This includes compensatory damages; back pay and front pay; mental anguish; humiliation and embarrassment; loss of reputation; foreseeable and unforeseeable damages, compensatory damages resulting from the breach of contract based on discrimination; prejudgment interest; and attorney's fees and all costs of these proceedings.

## JURY DEMAND

34.

Plaintiff hereby demands trial by jury of all issues so triable herein.

**WHEREFORE**, Plaintiff, Angela Melancon, prays that Defendant be required to appear and answer Plaintiff's Complaint and Jury Demand and, after due proceedings had and legal delays, there be judgment rendered herein in favor of Plaintiff and against Defendant as detailed in the foregoing Complaint and Jury Demand, in an amount reasonable in the premises, together

with legal interest from the date of judicial demand, all costs of these proceedings, attorneys'
fees and for any and all general and equitable relief deemed appropriate by this Honorable Court
under the circumstances.

Respectfully submitted,

/s/G. Karl Bernard_____
G. Karl Bernard (#24294)
KARL BERNARD LAW, LLC
1615 Poydras Street, Suite 101
New Orleans, LA 70112
Telephone: 504-412-9953
Facsimile: 504-412-8088
Email: karlb@karlblaw.com

**Attorney for Plaintiff, Angela Melancon**